# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ANGELA K. WARE,

      **Plaintiff,**

                                    **Civil Action 2:17-cv-01015**
                                    **Chief Judge Edmund A. Sargus, Jr.**
      **v.**                            **Chief Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**

## REPORT AND RECOMMENDATION

      Plaintiff, Angela K. Ware ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability Insurance benefits ("SSDI") and Supplemental Security Income benefits ("SSI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 13), Plaintiff's Reply (ECF No. 14), and the administrative record (ECF No. 7). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I. BACKGROUND

      Plaintiff applied for disability benefits and supplemental security income on October 5, 2011. (R. at 431, 439.) Plaintiff's claim was denied initially and upon reconsideration. (R. at 1.) Upon request, a hearing was held on September 7, 2016 in which Plaintiff, represented by

counsel, appeared by video and testified. (R. at 36, 59.) A vocational expert also appeared and testified at the hearing. (*Id.*) On September 28, 2016, Administrative Law Judge Christopher S. Tindale ("the ALJ") issued a decision finding that Plaintiff was not disabled at any time after November 1, 2009, the alleged onset date. (R. at 49.) On September 26, 2017, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–6.) Plaintiff then timely commenced the instant action. (ECF Nos. 1, 3.)

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified that she currently lives with her mother who has cancer, but her mother "helps as much as possible." (R. at 65.) She further testified that a family friend goes to the grocery store "and stuff" on her behalf. (*Id.*) She also stated that a family friend will take her to doctor appointments, because she does not drive due to panic attacks that she has had for several years. (*Id.*) Plaintiff testified that during her panic attacks her "chest starts pounding and then [she] start[s] . . . feeling funny, like [she] can't breathe, and then [she] start[s] shaking . . . ." (R. at 64.) Plaintiff stated that she has gone to the emergency room for her panic attacks. (*Id.*) Plaintiff also stated that she struggles with nightmares. (*Id.*) Plaintiff testified that she has been seeing a counselor, but that they come to her house rather than her going to their office because she "cannot hardly leave the house, it's just fear of leaving, like being in a hole." (R. at 63.)

Plaintiff also testified that she has had child custody issues with her ex-husband, and that he "kind of throws" her into a panic attack every time she calls to talk to her son, which is "usually every day." (R. at 67-68.) She stated that she gets panic attacks four to five times a week. (R. at 69.) She testified that she always keeps Xanax with her and will take it after a

panic attack starts.  (*Id.*)  She further testified that the panic attacks usually last "about ten to fifteen minutes" but sometimes they go longer, up to "like a half hour."  (*Id.*)  She stated the panic attacks are more frequent if she is outside her home.  (*Id.*)

The ALJ asked Plaintiff whether she has any physical problems that prevent her from working.  (R. at 70.)  Plaintiff testified that she will have periods of time where she could stand, but then she'll "just feel like [she has] to sit constantly" and that the longest she could probably stand would be a half hour.  (R. at 70-71.)  Plaintiff further testified that she has a problem lifting weight because she has a hernia.  (R. at 70.)  She estimated she could lift about ten pounds.  (R. at 70-71.)

### B. Vocational Expert Testimony

George W. Coleman, III testified as the vocational expert ("VE") at the September 2016 hearing.  (R. at 72.)  The VE testified that the past work Plaintiff performed in the last fifteen years included gas station cashier, kitchen helper, line operator, motel/hotel housekeeper, and home health aide.  (R. at 72-73.)  The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE.  (R. at 75.)

First, the ALJ asked the VE to assume a person of Plaintiff's age, education, and work experience who is able to perform light work, can frequently climb ramps and stairs, can only occasionally climb ladders, ropes, and scaffolds, can frequently stoop, kneel, couch, and crawl, who is limited to simple/routine tasks consistent with unskilled work in an environment free of fast production rate or fast-paced work, with no contact with the public and only occasionally contact with co-workers or supervisors, who must work in a low-stress environment.  (*Id.*)  The VE testified that an individual with these limitations could not perform Plaintiff's past work, but

could work as an office helper, personal assistant, cafeteria attendant, labeler, or marker II. (R. at 76-77.)

If everything was the same, except the exertion level was reduced to sedentary, the VE testified that there would not be any jobs available for that individual. (R. at 77.) If the individual were to be off task at least twenty percent of the workday, the VE testified that there would not be any jobs available for that individual because that would exceed the standard for being off task. (R. at 78.) If the individual would miss two days of work per week, the VE testified that would eliminate work competitively. (*Id.*)

## III. MEDICAL RECORDS

### A. Mental Health Assessments

In November 2011, Plaintiff underwent a mental health assessment conducted by a social worker. (R. at 741-49.) In the assessment, Plaintiff reported experiencing depression, sleep problems, and ADHD (R. at 741-42, 744.) Plaintiff also indicated that her relationship with her boyfriend was "not really too good." (R. at 741.) Plaintiff reported she "ran away with" a 32-year-old man when she was 13-years-old, then indicated that he abducted her and eventually went to prison for it. (R. at 742.) Plaintiff also reported that she cared for her four children, crafted with her children, baked, and used Facebook. (R. at 741-42.) Plaintiff's mental status exam indicated well roomed appearance, average demeanor, average eye contact, and clear speech. (R. at 747.) The social worker provided the following interpretive summary regarding the assessment of Plaintiff:

> [Plaintiff] presents for [mental health assessment] in order to start treatment for Depression, Anxiety, Panic attacks, and [history] of being abducted and molested from age 13 to 15. [Plaintiff's] current relationship with fiancé, Donald, is not healthy. He is controlling, critical and has let his 25 year old son move into the home. His son steals and has drug problems. [Plaintiff] has 4 children and is a stay home mom. She was in "slow learner" classes in school. Completed 10th grade.

> [Plaintiff] is applying for SSD and has an [attorney].  Chronic sleep problems.  [Plaintiff] was in foster care when she returned from being abducted.  Returned to mom's home at age 17.  No AOD issues.  No SI, HI, psychosis.  Motivated for treatment.  Some OCD traits.

(R. at 746.)

Plaintiff had a behavioral health counseling session in December 2011.  (R. at 862-63.)  The clinician noted that Plaintiff was "cooperative and receptive" during the session.  (R. at 862.)  Plaintiff reported that Donald continued to be "verbally mean and controlling" but that she had given him his ring back and "told him it was not working."  (*Id.*)  Plaintiff indicated that if social security disability was denied she would "try to get a job" working as an STNA in a nursing home.  (*Id.*)  Plaintiff had another behavioral health counseling session, again in December 2011.  (R. at 864.)  Plaintiff reported that "things were better than they were last time" and that she was "unsure in what direction she wants her relationship to go in."  (*Id.*)  The clinician noted that Plaintiff was able to identify personal goals for herself, and that she reported "standing up for herself more" and "voicing her needs."  (*Id.*)

In January 2012, Plaintiff had a behavioral health counseling session.  (R. at 878.)  Plaintiff reported that things were "ok," but she felt like she was "getting more angry."  (*Id.*)  She further reported that "as long as [she was] staying busy [she was] fine."  (*Id.*)  Additionally, Plaintiff indicated that she felt "a lot of her stressors are brought on by her boyfriend."  (*Id.*)  Plaintiff's next session was on February 6, 2012.  (R. at 879.)  Plaintiff indicated she felt as though she was being stalked.  (*Id.*)  Plaintiff's next session was on March 19, 2012.  (R. at 880.)  Plaintiff reported she felt she needs to end her relationship.  (*Id.*)  On April 9, 2012, Plaintiff had another behavioral health counseling session.  (R. at 881.)  She reported that "things are going smooth" and that her fiancé was "helping more around the house."  (*Id.*)  Plaintiff also had a session on July 2, 2012.  (R. at 882-83.)  She indicated she had severe anxiety most of her life,

stemming from the abduction incident.  (R. at 882.)  Plaintiff's mental status exam during the session showed that she was alert and oriented to person, place, and situation, and that she was not manic or psychotic in any way.  (*Id.*)

**B.**      **James Spindler, M.S., Clinical Psychologist**

Dr. Spindler[1] evaluated Plaintiff on March 21, 2012.  (R. at 750.)[2]  Plaintiff had been referred to Dr. Spindler by the Ohio Division of Disability Determination for a psychological evaluation relating to her claim for disability benefits.  (*Id.*)  When Plaintiff was asked to state in one sentence why she was applying for disability benefits, she replied "I am not able to comprehend with some jobs and I am bipolar."  (*Id.*)  Dr. Spindler noted that Plaintiff "had no apparent difficulty staying focused on the evaluation process."  (R. at 752.)  He also noted that she appeared to be "mildly depressed" and that she described her energy level as "poor."  (R. at 752-53.)  Dr. Spindler further noted that "[t]he concept of panic attacks was discussed with [Plaintiff] and she said she does not have such experiences."  (R. at 753.)  Furthermore, Dr. Spindler noted that Plaintiff "said she has no problems being in public places or around crowds of people that she does not know."  (*Id.*)  Regarding Plaintiff's activities of daily living, Dr. Spindler noted that Plaintiff is usually out of bed by 7:15 AM and gets her children off to school on time.  (*Id.*)  Dr. Spindler further noted that during the day Plaintiff attends to her baby and "might wash dishes, vacuum, mop, and do a load of laundry."  (*Id.*)  He also noted that Plaintiff "said she feels varying levels of depression and anxiety every day."  (*Id.*)

---

[1] The record is unclear as to whether James Spindler should be referred to as "Mr." or "Dr." Plaintiff refers to him as Dr. Spindler, while the Commissioner refers to him as Mr. Spindler. (ECF Nos. 8, 13.)  James Spindler holds an MS degree and works as a clinical psychologist.  (R. at 750.)  The Court will refer to him as Dr. Spindler.

[2] Dr. Spindler did not actually sign the evaluation form, but it does contain and a header with his name on the first page and a signature block with his name on the final page.  (R. at 750, 755.)

Dr. Spindler diagnosed Plaintiff with a depressive disorder (not otherwise specified) and a generalized anxiety disorder. (R. at 754.) He noted that Plaintiff's psychological stressors were raising four small children, relationship problems, and financial concerns. (*Id.*) He assigned Plaintiff an overall Global Assessment of Functioning ("GAF") score of 61.[3] (*Id.*) Regarding his functional assessment, Dr. Spindler noted that Plaintiff "seems capable of managing a variety of unskilled, labor-type jobs." (R. at 755.) Furthermore, he noted that Plaintiff "appears to have the mental ability to maintain a level of attention and concentration that would be sufficient for most job settings." (*Id.*) Additionally, he noted that Plaintiff "sees herself as a homemaker and may not be motivated to seek employment outside the home, especially since she is not getting along with her boyfriend and has no one but herself to care for her small children." (*Id.*) Finally, Dr. Spindler concluded that "[b]ased on clinical observations and what the [Plaintiff] has told the examiner, she appears to be handling the current stressors in her life reasonably well. However, it seems unlikely that she would handle the added stress of outside employment." (*Id.*)

### C.     Tony Goudy, Ph.D.

Dr. Goudy evaluated Plaintiff on March 13, 2014 "to determine if psychological factors could be adversely affecting her ability to pursue substantial gainful activity." (R. at 920.)[4]

---

[3] A GAF score is the measurement given by a clinician that in their subjective judgment encompasses an individual's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., 2000). The lower the GAF score, the greater indication of functional problems. *Id.* A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals) and/or serious impairment in social, occupational, or school functioning. *Id.* A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect, occasional panic attacks) and/or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score of 61 to 70 indicates mild symptoms (e.g., depressed mood and mild insomnia), and/or some difficulty in social, occupational, or school functioning. *Id.*

[4] Dr. Goudy did not actually sign the evaluation form, but it does contain and a header with his name on the first page and a signature block with his name on the final page. (R. at 920, 926.)

Plaintiff indicated that she is depressed and has frequent panic attacks. (R. at 921.) Plaintiff also recounted an incident of being abducted from ages 13 to 15 by a man in his 30s who forced her to have sex and drink alcohol. (*Id.*) Plaintiff did not recount this incident to Dr. Spindler. (R. at 750-55.) Plaintiff also told Dr. Goudy that since coming home after the abduction it has "always been hard for [her] to be in public." (*Id.*) Dr. Goudy noted that Plaintiff stated she suffers from panic attacks three times per week, on average. (*Id.*)

Dr. Goudy also noted that Plaintiff said she had a history of paranoia, particularly when she is in public. (R. at 924.) Additionally, Dr. Goudy noted Plaintiff "was well-oriented to time, place, person, and circumstance today." (*Id.*) Dr. Goudy diagnosed Plaintiff with chronic post-traumatic stress disorder, major depressive disorder (recurrent, moderate), and panic disorder without agoraphobia. (R. at 925.) Dr. Goudy assigned Plaintiff a GAF score of 50 to 55. (*Id.*) Dr. Goudy concluded that the mental status exam "revealed marked impairment in concentration and mild to moderate impairment in recent memory." (*Id.*) He noted that Plaintiff should be assessed under Listings 12.04 and 12.06. (*Id.*) Dr. Goudy noted "it is my opinion that [Plaintiff] meets a Listing based on a combination of psychological factors. If one does not accept that she meets a Listing based on the B criteria, she would clearly at least meet the C criteria, consistent with the Spindler evaluation . . . ." (R. at 926.)

On April 4, 2014, Dr. Goudy saw Plaintiff for a psychological evaluation update at the request of Plaintiff's counsel. (R. at 927.) Dr. Goudy discussed Dr. Spindler's evaluation with Plaintiff at this meeting. (*Id.*) Dr. Goudy noted that Dr. Spindler's GAF score of 61 did not seem consistent with his comment that "it seems unlikely that [Plaintiff] would handle the added stress of outside employment." (*Id.*) Dr. Goudy discussed this with Plaintiff, and Dr. Goudy indicated that Plaintiff made the following comment: "I was trying to push off my problems. I

didn't tell [Dr. Spindler] anything about [my abductor] because it was uncomfortable and I felt weird around him. I didn't really trust him and I didn't want to talk to him about all that stuff. I have trouble trusting people." (*Id.*)

### D. State Agency Psychological Consultants

In April 2012, state agency psychologist Aracelis Rivera, Psy.D., reviewed Plaintiff's records. (R. at 152-56.) Dr. Rivera opined that Plaintiff did not meet either Listing 12.04 or Listing 12.06. (R. at 152-53.) Dr. Rivera also opined that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone. (R. at 153.) Specifically, Dr. Rivera noted that Plaintiff "consistently accomplishes multiple tasks on a daily basis" and that some of the Plaintiff's allegations "appear out of proportion to the objective findings." (R. at 154.) Overall, Dr. Rivera opined that Plaintiff's statements regarding her symptoms and functional limitations were "only partially consistent." (*Id.*)

In August 2012, state agency psychologist Mel Zwissler, PhD., reviewed Plaintiff's records. (R. at 178-181.) Dr. Zwissler opined that Plaintiff did not meet either Listing 12.04 or Listing 12.06. (R. at 179-180.) Like Dr. Rivera, Dr. Zwissler opined that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone. (R. at 180.) Also like Dr. Rivera, Dr. Zwissler opined that Plaintiff's allegations regarding her symptoms and functional limitations are "only partially consistent." (R. at 181.)

## IV. ADMINISTRATIVE DECISION

On September 28, 2016, the ALJ issued his decision. (R. at 36-49.) At step one of the sequential evaluation process,[5] the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 1, 2009, the alleged onset date. (R. at 39.) The ALJ found that Plaintiff has the following severe impairments: disorders of the spine, mood disorder, anxiety disorder, and post-traumatic stress disorder. (*Id.*) The ALJ specifically noted that these "impairments significantly interfere with the [Plaintiff's] ability to engage in basic work-related activities[,]" making the impairments "severe" under "the specialized meaning of the Social Security Act." (*Id.*) However, the ALJ further noted that the severity of Plaintiff's impairments "is not so great as to be disabling." (*Id.*)

The ALJ further found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 40.) Furthermore, the ALJ concluded that "[n]o treating or examining physician has indicated that the [Plaintiff] has an impairment equivalent in

---

[5] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or
    equal the criteria of an impairment set forth in the Commissioner's Listing of
    Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant
    perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual
    functional capacity, can the claimant perform other work available in the national
    economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

severity to the criteria of any of the listed impairment[s.]" (*Id.*)  The ALJ indicated that he considered all applicable Listings in 20 C.F.R. § 404, Subpart P, Appendix 1.  (*Id.*)  Regarding Listings 12.04 and 12.06,[6] the ALJ made the following statement:

> The severity of the [Plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the [ALJ] has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

> In activities of daily living, the [Plaintiff] has reported maintaining personal care, performing household chores, grocery shopping, managing finances, preparing meals, and caring for her children.  As such, the [ALJ] finds only mild restriction in activities of daily living.

> In social functioning, the [Plaintiff] has moderate difficulties.  The [Plaintiff] alleged difficulty interacting with others and testified that she rarely leaves her home.  She noted, however, she is able to grocery shop and interact socially online, as she maintains a Facebook account.  Thus, the [ALJ] finds no more than moderate difficulties in social functioning.

> With regard to concentration, persistence or pace, the [Plaintiff] has moderate difficulties.  The [Plaintiff] reported difficulty understanding, remembering, following instructions, and concentrating; however, treatment records dated March 2016 note the [Plaintiff] demonstrated good ability to follow directions.  She has also shown improvement in functioning with medication.  Additionally, the record indicates she provides care for her children, she shops, she drives, she uses the computer, and she watches television and movies; all of which would require some memory, attention, concentration, persistence, and pace.  Therefore, the [ALJ] has provided for moderate difficulties with regard to concentration, persistence, or pace.

---

[6] After the ALJ issued his decision on September 28, 2016, the Agency revised listings 12.04 and 12.06.  However, the versions of the listings in effect at the time of the ALJ's decision govern this Court's review.  Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01, n.1 (Effective 1/17/2017.)

As for episodes of decompensation, the [Plaintiff] has experienced no episodes of decompensation, which have been of extended duration.

Because the [Plaintiff's] mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

(R. at 40-41.) The ALJ also considered whether the "paragraph C" criteria were satisfied. (R. at 41.) He found that the evidence failed to establish the presence of the "paragraph C" criteria. (*Id.*) The ALJ explained there was no medical evidence documenting a history of a chronic affective disorder or anxiety-related disorder that fit all of specifications of the "paragraph C" criteria of Listings 12.04 and 12.06. (*Id.*)

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

[Plaintiff] has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) with the following limitations: she can frequently climb ramps and stairs, but only occasionally climb ladders, ropes, or scaffolds. She can frequently stoop, kneel, crouch, and crawl. She is limited to simple, routine tasks consistent with unskilled work in a work environment free of fast production rate or pace work. She can have no contact with the public and only occasional contact with coworkers and supervisors. She must work in a low stress environment defined as having only occasional changes in the work setting and only occasional decision making required.

(*Id.*) The ALJ noted that Plaintiff testified about having a history of mental impairments. (R. at 42.) He also noted that Plaintiff claimed that she hardly left "her home due to panic attacks and discomfort around others." (*Id.*) He elaborated that Plaintiff "described the panic attacks as causing increased heart rate, shaking, and difficulty breathing" and that she "indicated the attacks occur 4 to 5 times per week lasting between 10 minutes and 30 minutes." (*Id.*) The ALJ also noted that Plaintiff testified that she "struggles with nightmares on a regular basis related to past childhood trauma" and that "she takes medications for her impairments." (*Id.*)

Furthermore, the ALJ concluded that the objective medical evidence in the record was inconsistent with Plaintiff's subjective complaints of pain and limitation. (R. at 43.) The ALJ

noted that Plaintiff had a history of significant childhood trauma, after which she suffered from depression and anxiety. (*Id.*) The ALJ discussed Plaintiff's mental health treatment records, including Plaintiff's complaints that arose during treatment, but found that despite Plaintiff's complaints, she "acknowledged she was able to care for her four young children and clean her home." (*Id.*) Additionally, the ALJ noted that Plaintiff "reported baking, doing crafts, and maintaining a Facebook account" and that on a mental status examination, Plaintiff "exhibited average eye contact, logical thought process, full affect, and average intelligence." (*Id.*) He also noted that in January 2012 Plaintiff reported that if she was staying busy she was "fine." (*Id.*)

The ALJ found that subsequent records documented similar findings as those he noted above. (*Id.*) For example, he noted, "during a consultative psychological evaluation . . . [Plaintiff] complained of anxiety and depression; yet, she appeared only mildly depressed on evaluation." (*Id.*) The ALJ elaborated on additional findings during that examination including that Plaintiff "appeared to have adequate insight and judgment" and that she "reported engaging in several activities of daily living, including caring for her young children, performing household chores . . . and preparing simple meals." (*Id.*) The ALJ further noted that Dr. Spindler, who was the examiner, diagnosed Plaintiff with depressive disorder (not otherwise specified) and generalized anxiety disorder, and estimated Plaintiff's GAF at 61, indicating moderate symptomology. (*Id.*) The ALJ additionally noted that Dr. Spindler had concluded that Plaintiff "may not be motivated to seek employment outside of the home" but that Dr. Spindler did not indicate any specific limitations in social functioning. (*Id.*) The ALJ also noted that while Dr. Spindler opined that Plaintiff "appeared to be handling current stressors reasonably well," he added that "it seems unlikely that she would handle the added stress of outside employment." (*Id.*)

The ALJ discussed Plaintiff's examination with Dr. Goudy on March 13, 2014. (R. at 43-44.) During the exam she relayed a history of childhood trauma and endorsed depressive and anxiety-related symptoms. (*Id.*) The ALJ noted though that on examination Plaintiff "appeared cooperative and oriented." (R. at 44.) He further noted that her immediate memory was impaired as she "exhibited difficulty maintaining attention and concentration." (*Id.*) Dr. Goudy diagnosed post-traumatic stress disorder, major depressive disorder, and panic disorder without agoraphobia and estimated Plaintiff's GAF between 50 and 55. (*Id.*) The ALJ concluded that

> Although Dr. Goudy opined the [Plaintiff] had marked limitation in social functioning and concentration, persistence, and pace and later opined she had extreme limitation in dealing with work stress, such assessment appears to be largely based on the [Plaintiff's] subjective complaints and is inconsistent with the record as a whole, including prior and subsequent psychiatric examinations, which demonstrate less limitation in functioning.

(*Id.*) The ALJ then explained the parts of the record that he found to be inconsistent with Dr. Goudy's opinion. (*Id.*) This included all of the following:

- "[L]ess than one month after the psychological evaluation, the [Plaintiff] again reported her medications were helping her mood and emotions." (*Id.*)

- "In August 2014, the [Plaintiff] reported increased anxiety attacks; however, she also relayed an increase in personal stressors, which likely contributed to her complaints." (*Id.*)

- "By April 2015, the [Plaintiff] again admitted she was 'Overall doing fairly well.'" (*Id.*)

- "On December 14, 2015, it was observed the [Plaintiff] was 'Doing better now with taking Lexapro as long as she takes a Xanax with it.'" (*Id.*)

- "In February and March 2016 . . . the [Plaintiff] remained doing well from a psychological standpoint." (*Id.*)

- "On psychiatric examination performed in March 2016, the [Plaintiff] appeared alert and oriented and demonstrated appropriate cognitive skills." (*Id.*)

- "In June 2016, it was noted the [Plaintiff] continued to be 'Overall doing well. Still with some anxiety issues related to increased stress.'" (*Id.*)

- "[T]he [Plaintiff] has reported engaging in several activities of daily living, including social activities such as shopping, texting, and using Facebook, which further suggest she is not as limited as alleged." (*Id.*)

The ALJ ultimately surmised that "given the signs and findings on evaluations, reports of improvement with medication, and [Plaintiff's] own reports of activities of daily living and functioning, the undersigned finds mild to moderate mental limitation to be appropriate[.]" (*Id.*)

The ALJ gave "significant weight" to the two state agency consultants who completed Psychiatric Review Techniques and Mental RFC Assessments for Plaintiff. (R. at 45.) The ALJ noted that each consultant had opined that Plaintiff had "mild to moderate mental limitations." (*Id.*) The ALJ explained that their "assessments are based on and generally consistent with the medical evidence of record as a whole, including the [Plaintiff's] reports of functioning and improvement." (*Id.*) The ALJ further noted that he included somewhat different limitations in the RFC, though. (*Id.*)

The ALJ gave "some weight" to Dr. Spindler's opinions that were based on a psychological evaluation of Plaintiff on March 21, 2012. (R. at 46.) The ALJ explained that he gave Dr. Spindler "only some weight" because "his assessment is vague and not in specific vocational terms and many of his opinions, including the ability to handle work stress, appear to be based primarily on the claimant's subjective reports and not the objective evidence." (*Id.*)

Furthermore, the ALJ noted that Dr. Spindler's assessment was "based on a one-time examination of the [Plaintiff]." (*Id.*)

The ALJ gave "little weight" to Dr. Goudy's opinions that were based on a psychological evaluation of the Plaintiff on March 13, 2014. (*Id.*) The ALJ explained that Dr. Goudy's "assessment appears to be largely based on the [Plaintiff's] subjective complaints and is inconsistent with the record as a whole, including prior and subsequent psychiatric examinations, which demonstrate less limitation in functioning." (*Id.*) Furthermore, the ALJ concluded that "Dr. Goudy's opinions are given little weight as they are extreme and appear to be primarily based on the [Plaintiff's] subjective report of symptoms." (*Id.*) The ALJ further concluded that Dr. Goudy's opinions "are inconsistent with the record, including the [Plaintiff's] reports of activities of daily living/functioning and reports of improvement with medication." (*Id.*) The ALJ also noted that Dr. Goudy's opinions are "internally inconsistent" in that he opined that Plaintiff had many marked limitations and one extreme limitation, "which is inconsistent with a GAF score of 50 to 55." (*Id.*) Finally, the ALJ included that Dr. Goudy's examination was "a one-time examination of the [Plaintiff]" and "his opinions are not consistent with the longitudinal history." (*Id.*)

The ALJ concluded that Plaintiff is unable to perform any of her past relevant work as a gas station cashier, kitchen helper, line operator, or home health aide. (R. at 47.) The ALJ noted that "the vocational expert opined that an individual with [Plaintiff's limitations] could not perform the [Plaintiff's] past work" and that "[t]here is no evidence to the contrary." (*Id.*) The ALJ found, however, that considering the Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the Plaintiff can

perform.  (R. at 48.)  He therefore concluded that Plaintiff was not disabled under the Social

Security Act from November 1, 2009, through the date of the administrative decision.  (R. at 49.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

# VI. ANALYSIS

Plaintiff puts forward two assignments of error. Plaintiff contends that the ALJ failed to properly evaluate the mental health evidence of record. (ECF No. 8, at p. 6.) Plaintiff also contends that the ALJ erroneously found that Plaintiff did not meet or equal Listing 12.04 or 12.06. (*Id.*, at p. 10.) The Undersigned addresses each contention in turn.

## A. Mental Health Evidence of Record

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c); *see also* SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions."). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). Regardless of the source of a medical opinion, in weighing the opinion, the ALJ must apply the factors set forth in 20 C.F.R. § 416.927(c), including the examining and treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the source.

With her first contention of error, Plaintiff maintains that the ALJ "discredited the mental health opinions of the only sources of record that had the opportunity to examine, observe, and personally evaluate [Plaintiff, and] instead relied on the opinions of the state agency psychological consultants." (*Id.*, at p. 6.) Specifically, Plaintiff asserts that the ALJ failed to

provide valid reasons, supported by substantial evidence, for discrediting the opinions of Dr. Spindler and Dr. Goudy.  (*Id.*)

The ALJ gave "some weight" to the opinions of Dr. Spindler, and "little weight" to the opinions of Dr. Goudy.  (R. at 46.)  In doing so, the ALJ properly explained that the objective medical evidence did not support the notion that Plaintiff was disabled.  Substantial evidence supports this conclusion.  For instance, in November 2011 Plaintiff underwent a mental health assessment where she reported that she takes care of her children, keeps her home clean, socializes via Facebook, and has no physical limitations related to activities of daily living.  (R. at 741-42.)  In January 2012, during a counseling session, Plaintiff reported that if she "was staying busy" she was fine, and that she felt "a lot of her stressors are brought on by her boyfriend."  (R. at 878.)  At the hearing in September 2016, Plaintiff reported she was no longer dating him.  (R. at 88.)  Furthermore, from 2013 onward, the medical evidence indicated that Plaintiff's medication allowed her to do well overall.  (R. at 1117, 1169, 1222, 1234, 1239, 1333, 1335, 1387.)  "Generally, the more consistent a medical opinion is with the record as a whole, the more weight [will be given] to that medical opinion."  20 C.F.R. § 404.1527(c)(4).  Here, it was appropriate for the ALJ to discount the opinions of Dr. Spindler and Dr. Goudy, as they were not substantially supported by the medical evidence.  *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 273-74 (6th Cir. 2010) (finding ALJ did not err in rejecting medical opinion premised upon claimant's subjective complaints that were not supported by objective medical evidence).

Furthermore, regarding Dr. Goudy's opinions, the ALJ reasonably found that his opinions were internally inconsistent.  (R. at 44.)  For example, Dr. Goudy reported an opinion of marked limitations in social functioning, concentration, persistence, and pace, and one extreme limitation dealing with work stress for Plaintiff, which was inconsistent with the GAF score of 50 to 55.

(R. at 925, 935-36.)  Additionally, the opinions of Dr. Spindler and Dr. Goudy were in part based on Plaintiff's subjective reports, which differed markedly between the two assessments.  For instance, Plaintiff recounted an instance of a childhood abduction lasting for two years to Dr. Goudy, which she reported caused her to have panic attacks and depression.  (R. at 920-25.)  However, Dr. Spindler noted that the concept of panic attacks was discussed with Plaintiff and she reported that she did not have such experiences.  (R. at 753.)  Plaintiff also did not recount the abduction to Dr. Spindler, though she reported to Dr. Goudy this was because she felt "uncomfortable" and "weird" with Dr. Spindler.  (R. at 927.)  Accordingly, the ALJ properly discredited the two doctors' opinions, as they were in large part based on unsubstantiated and subjective reports by the Plaintiff.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) (holding that physicians' opinions are not due much weight when premised on reports made by a patient that the ALJ found to be not credible).  *Ferguson*, 628 F.3d at 273-74 (finding no error in discounting opinion based on claimant's subjective complaints).

Plaintiff asserts that the ALJ should not have given more credit to the opinions of the state agency psychologists who did not examine her.  (ECF No. 8, at p. 6.)  However, other medical sources, including the state agency psychologists, found Plaintiff to be far less limited than Dr. Goudy reported.  (R. at 152-56, 179-55, 920-26.)  It is proper for an ALJ to choose to credit the findings of one medical source over another, because such a conclusion falls within an ALJ's "zone of choice" within which "he can act without the fear of court interference."  *See Kent v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 643, 651 (S.D. Ohio 2015) (quoting *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001)).  Here, the ALJ properly concluded that the opinions of the state agency psychologists were entitled to more weight than those of Dr. Goudy and Dr. Spindler.

Plaintiff takes issue with the ALJ's conclusion that Dr. Spindler's assessment "is vague and not in specific vocational terms." (ECF No. 8, at p. 8; ECF No. 14, at p. 2-3.) Specifically, Plaintiff asserts that the ALJ did not properly take under consideration Dr. Spindler's statement that "it seems unlikely that [Plaintiff] would handle the added stress of outside employment." (R. at 755.) Plaintiff further argues that "[t]he ALJ should not be able to disregard this vital limitation because he claims to not be able to properly interpret the 'vague' limitation." (ECF No. 8, at p. 8.) Dr. Spindler's assessment that "it seems unlikely" that Plaintiff would handle the stress of outside employment is, in fact, vague. Dr. Spindler did not identify what stressors could be compounded by work or any aspect of employment that would trigger stress. Furthermore, Dr. Spindler does not affirmatively state that Plaintiff would be unable to handle the stress, simply that it is "unlikely." Plaintiff fails to put forth any medical evidence or case law to support her assertion. Indeed, where a plaintiff challenges an ALJ's mental-health related findings but does not explain what limitations the ALJ erred in excluding or point to any evidence from within the applicable period suggesting that she had additional mental-health related restrictions, then the plaintiff's challenge is meritless. *McNier v. Comm'r of Soc. Sec.*, 166 F. Supp. 3d 904, 914 (S.D. Ohio, Feb. 23, 2016.) Here, because she does not put forth supporting evidence or point out limitations the ALJ erred in excluding, Plaintiff's argument is without merit.

The Undersigned finds, therefore, that the ALJ properly evaluated the mental health evidence of record and his evaluation is supported by substantial evidence.

B. Listings 12.04 and 12.06

In determining whether a claimant is disabled, an ALJ must consider whether the claimant's impairments meet Social Security Listing requirements. 20 C.F.R. §§

404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. § 404.1520(d). A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.") The claimant shoulders the burden of producing medical evidence that establishes that all the elements are satisfied. *Evans v. Secretary of Health & Human Services*, 820 F.2d 161, 164 (6th Cir. 1987).

It is not sufficient to simply come close to meeting the conditions of a Listing. *See, e.g.*, *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (affirming Commissioner's decision where medical evidence "almost establishes a disability" under Listing). The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c). Listing 12 addresses nine specific mental disorders. Every mental disorder addressed in the Listing includes two components, a diagnostic component that consists of a description of the mental disorder, and a severity component that consists of specific criteria measuring the severity of the identified mental disorder. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 (A)-(C).

Listing 12.04 addresses affective disorders. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04. To satisfy this Listing, Plaintiff must demonstrate that she satisfies both the "A" and "B" criteria. The criteria in paragraph "B" requires Plaintiff to show that her mental impairments resulted in two of the following: (1) marked restrictions in activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining

concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration.  *Id.* at § 12.04(B).

Here, the ALJ addressed each of the four categories for the criteria in paragraph B.  (R. at 40-41.)  His analysis enjoys substantial support in the record.  Regarding activities of daily living, Plaintiff reported maintaining personal care, performing household chores, grocery shopping, managing finances, preparing meals, and caring for her children.  (R. at 65, 508-09, 741, 866.)  Regarding social functioning, Plaintiff is able to grocery shop at the store and maintains a Facebook account to socialize with others.  (R. at 65, 741-42.)  Additionally, Dr. Spindler did not report any restrictions on Plaintiff's social functioning, and the state agency psychologists reported only that Plaintiff had moderate difficulties in social functioning.  (R. at 153, 179-80, 750-57.)  Dr. Goudy was the one outlier, as he opined that Plaintiff had marked limitation in social functioning.  (R. at 920-26.)  However, his reports were largely based on Plaintiff's subjective complaints, which as discussed earlier were inconsistent with the record as a whole.  *See Selva v. Comm'r of Soc. Sec.*, No. 2:14-cv-2653, 2015 WL 5384391, at *5 (S.D. Ohio, Sept. 14, 2015) (finding that ALJ properly discounted physician's opinions that were based on plaintiff's subjective complaints).

Regarding concentration, persistence, or pace, Plaintiff's March 2016 treatment records indicate that she demonstrated a good ability to follow directions.  (R. at 1337-61.)  Additionally, the record indicates that Plaintiff showed improvement in functioning when on her medications. (R. at 1117, 1169, 1222, 1234, 1239, 1333, 1335, 1387.)  Also, Dr. Spindler opined that Plaintiff appeared "to have the mental ability to maintain a level of attention and concentration that would be sufficient for most job settings."  (R. at 755.)  Furthermore, the same activities mentioned regarding activities of daily living, such as caring for children, require concentration, persistence,

and pace. (R. at 65, 508-09, 741, 866.) Regarding episodes of decompensation, Plaintiff reported no such experiences. (*See* R. at 41, 153, 165, 180, 193, 926.) Accordingly, substantial evidence supports the ALJ's finding that Plaintiff did not meet any of the four categories of paragraph "B" criteria. *See Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.").

A claimant may also meet Listing 12.04 by satisfying both the "A" and "C" criteria. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04. To meet the paragraph "C" criteria, Plaintiff must show (1) evidence of a medically documented history of a chronic affective disorder or anxiety-related disorder of at least two years' duration that has caused more than minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, AND (2) repeated episodes of decompensation, each of an extended duration, (3) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate, OR (4) a current history of one or more years' inability to function outside of a highly supportive living arrangement, with an indication of continued need for such arrangement. *Id.* at § 12.04(C).

Plaintiff asserts that the ALJ did not provide any explanation for why the "C" criteria were not met. (ECF No. 8, at p. 10.) The ALJ, however, considered whether the paragraph "C" criteria were satisfied, and found the evidence failed to establish the presence of such criteria. (R. at 41.) Plaintiff appears to take issue with the fact that the ALJ's explanation does not go beyond this simple assertion within that particular paragraph. Yet, the ALJ cited relevant

objective evidence elsewhere in his ruling. For example, the ALJ noted, in referencing the paragraph "B" criteria, that Plaintiff had not experienced any episodes of decompensation. (R. at 41, 153, 165, 180, 193, 926.) The ALJ also noted that Plaintiff reported maintaining personal care, completing household chores, grocery shopping, managing finances, preparing meals, caring for her children, a desire to live alone, and later obtaining her own apartment, which all indicated that there was no residual disease process or chronic affective disorder/anxiety-related disorder that disabled Plaintiff. (R. at 41, 65, 67, 505-12, 750-57.) Indeed, the ability to shop, along with comments that one would like to live alone, is substantial evidence that a plaintiff failed to meet the "C" criteria for Listing 12.04. *Braun v. Comm'r of Soc. Sec.*, No. 1:12-cv-12, 2013 WL 443542, at *6 (S.D. Ohio, Feb. 5, 2013). Furthermore, as the ALJ pointed out, Plaintiff's mental impairments were managed with medication and that she reported doing well overall. (R. at 43-44, 1117, 1169, 1222, 1234, 1239, 1333, 1335, 1387.) Additionally, the state agency psychologists considered whether Plaintiff met Listing 12.04(C) and found that she failed to do so. (R. at 153, 180). Substantial evidence supports the ALJ's finding that Plaintiff did not meet or medically equal Listing 12.04.

Listing 12.06 addresses "anxiety-related disorders." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.06. To satisfy this Listing, Plaintiff must demonstrate that she satisfies both the "A" and "B" criteria or alternatively, that she satisfies the "C" criteria of the Listings. The criteria in paragraph "B" "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(A). The term "marked" as it is used under the criteria is not defined by a specific quantitative threshold but is instead evaluated "by the nature and overall degree of interference with function." *Id.* at § 12.00(C).

The paragraph "B" criteria for Listing 12.04 is identical to that for Listing 12.06. Accordingly, the analysis set forth above, that the ALJ properly found that Plaintiff failed to meet any paragraph "B" criteria for Listing 12.04, applies as well to the paragraph "B" criteria for Listing 12.06. Therefore, the ALJ's finding that Plaintiff failed to meet the paragraph "B" criteria for Listing 12.06 was supported by substantial evidence.

As with Listing 12.04, a claimant may also meet Listing 12.06 by satisfying both the "A" and "C" criteria. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.06. To meet the paragraph "C" criteria for Listing 12.06, a plaintiff must show medically documented findings of generalized persistent anxiety "resulting in complete inability to function independently outside the area of [his or her] home." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.06(C). The ALJ reasonably found that the evidence did not indicate that Plaintiff's mental impairments resulted "in complete inability to function independently outside the area of [her] home." For instance, the record reflects that Plaintiff drives and goes to the grocery store. (R. at 42, 506-08.) While Plaintiff reported she usually has someone who goes out with her, there are instances where she "go[es] out alone." (R. at 508.) Indeed, this Court has found that a plaintiff who attended church and counseling outside of her home did not meet the paragraph "C" criteria of Listing 12.06. *Postma v. Astrue*, No. 1:11-cv-1703, 2012 WL 3912858, at *2 (S.D. Ohio, Sept. 2, 2012). Furthermore, Plaintiff also reported to Dr. Spindler that "she has no problems being in public places or around crowds of people that she does not know." (R. at 753.) Accordingly, the ALJ properly found that Plaintiff did not meet or medically equal the paragraph "C" criteria of Listing 12.06.

In her statement of errors, Plaintiff fails to point to any evidence that she met Listing 12.04 or 12.06, except to assert that Dr. Goudy opined that she met both. (ECF No. 8, at p. 10.)

Dr. Goudy's specific statement was that it was his "opinion that [Plaintiff] meets a Listing based on a combination of psychological factors. If one does not accept that she meets a Listing based on the B criteria, she would clearly at least meet the C criteria, consistent with the Spindler evaluation . . . ." (R. at 926.) This statement of opinion is not enough to establish that Plaintiff met the Listings, nor is it enough to overcome the substantial evidence supporting the ALJ's finding that she did not meet either Listing. *See Longworth*, 402 F.3d at 595 ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.").

Furthermore, other than arguing that the ALJ should have accepted Dr. Goudy's opinion, Plaintiff has failed to present a developed argument that she meets or equals Listings 12.04 or 12.06. This failure amounts to a waiver. *Cherry v. Comm'r of Soc. Sec.*, No. 1:12-cv-00880, 2014 WL 972157, at *5 (S.D. Ohio, Mar. 12, 2014) (citing *McClellan v. Astrue*, 804 F. Supp. 2d 678, 688 (E.D. Tenn. 2011) (arguments in social security appeal not raised or supported in more than a perfunctory manner may be deemed waived). Plaintiff did not adequately support her assertion that she met or medically equaled Listings 12.04 and/or 12.06. Rather, substantial evidence supported the ALJ's findings that Plaintiff neither met nor medically equaled either Listing.

The Undersigned finds, therefore that the ALJ did not err in finding that Plaintiff did not meet or equal Listings 12.04 and 12.06, and that this finding was supported by substantial evidence.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is

**RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## <u>PROCEDURE ON OBJECTIONS</u>

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: February 20, 2019

                                                             ___/s/ *Elizabeth A. Preston Deavers*___
                                                            ELIZABETH A. PRESTON DEAVERS
                                                            CHIEF UNITED STATES MAGISTRATE JUDGE